NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO M.H.

No. 1 CA-JV 23-0109
FILED 11-16-2023

Appeal from the Superior Court in Maricopa County
No. JD42304
The Honorable Michael J. Herrod, Judge

**AFFIRMED**

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Brian Y. Furuya delivered the decision of the Court, in which Presiding Judge James B. Morse Jr., and Judge Cynthia J. Bailey joined.

**F U R U Y A**, Judge:

¶1     Mother appeals the juvenile court's order adjudicating her child dependent. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2     Mother and Father are the parents of M.H., born in January 2020. The parents moved to Arizona in 2017, and over the next five years, engaged in significant domestic violence resulting in several arrests and over twenty police reports. Consistent with Mother's statement to police that the violence was escalating, eight of the incidents occurred between May and September 2022. During several of the incidents, police described Mother as intoxicated and aggressive. In the past, Mother participated in court-ordered domestic violence classes and therapy to no avail.

¶3     In September 2020, police arrested Father after he reportedly choked Mother and bruised her arms. Mother stated she was afraid of Father because he had previously threatened to kill her, but she had no independent financial means to support herself. Mother had opportunities to stay elsewhere after the incident, including with friends and family, but she declined them and returned to Father. The Department of Child Safety ("DCS") also offered the family in-home services, which they declined.

¶4     In May 2022, Father was arrested after Mother reported he had picked her up by the neck, pushed her against a wall, and knocked her to the ground. Mother later told DCS Father was "jealous of the attention [M.H.] got from her" and had threatened to kill her numerous times. Mother also said she was "concerned for [M.H.'s] safety," while simultaneously denying he was in danger from the domestic violence. Father obtained an order of protection against Mother, but both parents violated the order, which was later quashed.

¶5     Mother completed a domestic violence class in September 2022. That same month, DCS implemented a safety plan in which Father moved out of the home and a relative moved in with Mother to ensure

M.H.'s safety and immediately report any escalating situation between the parents.

¶6 Nonetheless, the parents violated the safety plan twice. First, Mother was arrested for disorderly conduct after she physically attacked Father. She was placed on house arrest and prohibited from contacting him. A month later, DCS found Mother and Father in the home with M.H., without the other relative present. DCS took custody of M.H. and filed a dependency petition.

¶7 At that time, Mother denied that her and Father's domestic violence had any effect on M.H. DCS asked Mother to complete substance abuse testing and treatment, a psychological evaluation, individual and domestic violence counseling, anger management courses, the Nurturing Parenting Program, and the Family Connections program. Mother participated in services and successfully completed the Nurturing Parenting Program and a domestic violence and parenting class. She also began individual counseling but continued to deny or minimize her domestic violence and mental health issues.

¶8 In November 2022, Mother completed a psychological evaluation. The psychologist diagnosed her with an unspecified personality disorder with borderline traits and with severe alcohol use disorder. The borderline traits the psychologist observed in Mother include impulsivity, mood dysregulation, anger, threats, acts of self-harm, and paranoia. The psychologist also reported it was "evident that [Mother] has an alcohol addiction as well as significant emotional instability and poor frustration tolerance."

¶9 Mother minimized the violence and denied alcohol use, leading the psychologist to determine she was in denial or had poor insight, "which will pose a significant barrier to treatment and change." The psychologist also opined that Mother's borderline traits significantly impair her parenting abilities and that children in her care are at risk of physical harm, "especially if weapons and property damage is involved, which has occurred on at least two occasions with [the parents]." The psychologist gave Mother a poor prognosis of safely parenting M.H. in the future, recommending a psychiatric consultation for possible medication; domestic violence, healthy relationship, anger management, and parenting classes; marriage counseling if Mother remained with Father; Dialectical Behavior Therapy ("DBT"); and outpatient substance abuse treatment. The psychologist stressed that DBT and substance abuse treatment be prioritized over marriage therapy.

¶10          In January 2023, Mother completed a substance abuse assessment, but—based solely on her self-report—was not recommended for further services. Likewise, Mother completed two psychiatric evaluations, one with a nurse practitioner and one with a master's level behavioral health professional. At each, Mother denied she used alcohol or had experienced any mental health symptoms, and she did not provide the evaluators with a complete copy of her previous psychological evaluation. DCS therefore rejected these evaluations and asked her to complete an exam with a psychiatrist.

¶11          That same month, Mother reported that Father had moved out of state. Based on Father's move and Mother's participation in services, DCS returned M.H. to Mother's care, again with a safety plan. This plan required Mother or the safety monitor to notify DCS if Father returned to Arizona for visits and required the monitor to supervise any visits and to remove M.H. if Father remained in the home.

¶12          Mother was eventually evaluated by a psychiatrist. But again, she denied any psychiatric symptoms or recent alcohol use and gave noncommittal answers when asked about reconciling with Father. Mother also denied or declined to answer questions about whether she had behaved aggressively in the past. Although the psychiatrist was suspicious of Mother's denials, he only diagnosed her with relationship distress and a history of partner violence and prescribed no medication.

¶13          About a month later, the case manager observed Mother and Father arguing over the phone. The following month, the juvenile court held a dependency hearing. At that time, Mother had not yet participated in DBT and had only completed about three months of individual counseling. The court adjudicated M.H. dependent, and Mother appealed. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 8-235(A).

## DISCUSSION

¶14          Mother argues insufficient evidence supports the juvenile court's dependency order. We accept the court's factual findings "if reasonable evidence and inferences support them" and will affirm the court's legal conclusions "unless they are clearly erroneous." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79 ¶¶ 30–31 (2023) (citation omitted). The court's legal conclusions are clearly erroneous only if we determine "as a matter of law that no one could reasonably find the evidence" supporting them meets the applicable burden of proof. *Id.* at 479 ¶ 31 (citation omitted).

**¶15** The court must determine whether a child is dependent by a preponderance of the evidence. A.R.S. § 8-844(C)(1). As relevant here, a "[d]ependent child" is one who is adjudicated to be "[i]n need of proper and effective parental care and control and who has . . . no parent . . . willing to exercise or capable of exercising such care and control" or "whose home is unfit by reason of abuse [or] neglect . . . by a parent, a guardian or any other person having custody or care of the child." A.R.S. § 8-201(15)(a)(i), (iii). "Neglect" means a parent's "inability or unwillingness . . . to provide [a] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

**¶16** "[T]he juvenile court must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48 ¶ 1 (App. 2016). A child may be dependent when the parent is unwilling or unable to protect the child from abuse or neglect. *See id.* at 50 ¶ 14.

**¶17** Here, Mother argues the court had no basis for finding she had not addressed her domestic violence, alleged alcohol abuse, and any "other concerns related to her parenting." She cites her participation in services and contends that because Father no longer lived in the home, "there was no 'imminent risk of harm' to M.H.[,] and the previous threats to his safety had been adequately resolved."

**¶18** Although Mother participated in services, the court nevertheless found she had "not addressed the issues concerning domestic violence, nor her past history of alcohol abuse that fuels the domestic violence." Reasonable evidence in the record supports this finding. The record shows the parents have a fourteen-year history of significant domestic violence which was ongoing only six months before trial. After the parents moved to Arizona, several police reports indicate Mother was intoxicated and the aggressor in the altercations, including one in which she became intoxicated and began a fight with two female neighbors. Another report indicated Mother had cut herself and threatened to commit suicide. And after Mother completed a domestic violence class in September 2022, she physically attacked Father only three days later and argued with him over the phone a month before trial.

**¶19** Regarding her mental health, Mother was diagnosed with unspecified personality disorder with borderline traits and severe alcohol use disorder. Despite Mother's assertion she had not drunk alcohol since

moving to Arizona, the psychologist reported it was "evident that [Mother] has an alcohol addiction as well as significant emotional instability and poor frustration tolerance." Indeed, Mother admitted to being "a little buzzed" at a domestic violence incident in September 2022. When asked at trial about her alcohol use, Mother suggested she had not drunk alcohol "in a long time," but acknowledged the psychologist could have been "confused" by the police reports stating she was intoxicated. Considering this evidence, the court did not err in finding Mother "appears to be trying to superficially comply with services" without "addressing the real underlying issues of domestic violence, lack of impulse control, and mood dysregulation." Nor did the court err in its impression that Mother is "in denial concerning the issues that brought [M.H.] into care, and that Mother minimizes her [own] behaviors and needs."

¶20        Nor does Mother's participation in services substantiate her assignment of error. As the court further found, Mother failed to "compl[y] with the case plan by failing to engage in DBT therapy." The record likewise supports this finding.

¶21        By trial, Mother had engaged in only three months of individual counseling and still had not engaged in DBT or substance abuse treatment, which the evaluating psychologist described as crucial to her safely parenting M.H. She also continued to minimize her prior domestic violence, going so far as to claim that, contrary to past reports, no domestic violence had occurred in M.H.'s presence and that she had not physically attacked Father.

¶22        Further, although Mother notes she underwent two psychological evaluations, she chose inappropriate providers to conduct her psychiatric evaluations, "either purposely or through misunderstanding," and, at those evaluations, she did not share her previous psychological evaluation and denied or minimized her alcohol use, aggression, domestic violence, and mood issues. The court gave these evaluations no weight, and we will not reweigh that determination on appeal. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002) ("The resolution of such conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact; we do not re-weigh the evidence on review.").

¶23        As to the court's concerns about Father, Mother had not severed her relationship with him, instead giving noncommittal answers when asked by the psychiatrist. Nor had she participated in marriage counseling with Father, which Mother's evaluating psychologist stated was

necessary or their domestic violence "will continue indefinitely." Despite these issues, Mother testified Father was a "changed man," and she had no concerns about allowing him back into the home. And despite her significant unaddressed history of domestic violence with Father, Mother stated she believed domestic violence was no longer a concern in her life.

**¶24** Accordingly, the court's factual findings are supported by reasonable evidence, and its order finding M.H. a dependent child is supported by a preponderance of the evidence.

## CONCLUSION

**¶25** We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA